# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### April 22, 2015 Session

## STATE OF TENNESSEE v. MARCUS SMARTT

**Appeal from the Circuit Court for Rutherford County**
**No. F-67357     David M. Bragg, Judge**

**No. M2014-01093-CCA-R3-CD – Filed June 9, 2015**

A jury convicted the defendant, Marcus Smartt, of two counts of aggravated sexual battery, Class B felonies, and one count of solicitation of a minor to engage in aggravated sexual battery, a Class C felony. The trial court sentenced the defendant to ten years' imprisonment for each aggravated sexual battery conviction, to be served consecutively, and to five years for the solicitation conviction, to be served concurrently, for an effective sentence of twenty years. On appeal, the defendant challenges the trial court's denial of his motions for a mistrial and the trial court's decision to admit evidence that he asserts is inadmissible propensity evidence. He also alleges prosecutorial misconduct during closing argument. After a thorough review of the record, we conclude that the trial court did not commit error on the grounds presented, and we affirm the defendant's convictions for aggravated sexual battery. However, we conclude that the solicitation conviction must merge into one of the aggravated sexual battery convictions, and we remand for further proceedings in accordance with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Gerald L. Melton, District Public Defender and Russell N. Perkins, Assistant District Public Defender, for the appellant, Marcus Smartt.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant

Attorney General; Jennings Jones, District Attorney General; and Laural Hemenway, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

The defendant was indicted for three counts of aggravated sexual battery and one count of solicitation to commit aggravated sexual battery after his ex-girlfriend's twin children revealed that he had had sexual contact with them at the time that they were around five years old. The defendant was tried December 10-13, 2012.

C.P.[1] gave birth to the victims of these crimes, S.P., a boy, and M.P., a girl, on August 14, 1996. Sometime thereafter, she and the victims' father separated, and she began living with the defendant, with whom she had another child in the year 2000. By all accounts, the victims had a very close relationship with the defendant and all of his family. The victims looked on the defendant as a step-father, and the defendant's sister married the victims' father after he and the victims' mother separated. The defendant's mother lived with the victims, their mother, their sister, and the defendant for a period of time after the crimes alleged in the indictment, providing childcare for the victims and their younger sister. The victims called her "Nonna," and she considered them as her grandchildren. The defendant's brother also stayed briefly with the family, sleeping on a couch when he had nowhere to stay.

The victims' mother testified that she lived in Rutherford County for three or four years and that she moved away on September 18, 2003. She and the defendant lived in three or four different houses together. The victims' mother testified that she was the main income provider and that they moved often because they could not always pay their bills. She testified that she suffered from postpartum depression and post-traumatic stress disorder through the time the abuse occurred and that she was hospitalized for these conditions. According to the victims' mother, the defendant controlled her ability to leave the house, and she was only permitted to go to work and on a daily forty-five minute walk with the defendant's brother's girlfriend. She testified that her failure to return on time would lead to conflict. When the prosecutor attempted to explore the conflict, the defendant asked for a jury-out hearing to determine the admissibility of the proffered evidence.

---

[1] In order to protect the identity of victims of sexual crimes, we will refer to the victims and their family members by their initials.

During the hearing, the victims' mother testified that there was both verbal and physical conflict in the house and that the children witnessed both. She testified that the defendant was controlling in various ways. The victims' mother testified that when she said she wanted to leave the state, the defendant threatened to kill their younger daughter and the twins and to make her watch. She also testified that the defendant had assaulted her, pushing her so that she broke her tailbone when she was eight months pregnant. The prosecution referenced a police report filed as part of discovery in which officers witnessed the defendant holding the victims' mother down. The victims' mother also referred to an incident in which S.P. told her that the defendant had stuck a needle into his groin and the defendant claimed he had been fixing S.P.'s pants. The prosecution argued that the evidence of these bad acts should come in because the defendant's sexual abuse was motivated by his desire to control the family and because the prior bad acts were pertinent to the victims' delay of some six or seven years in reporting the crimes. The trial court concluded that the relationship of the people in the house was relevant to the allegations and to the timing of the victims' disclosure, but it excluded any evidence of domestic violence, concluding that its probative value was outweighed by the danger of unfair prejudice.

When the trial resumed in front of the jury, the prosecutor asked about ways in which the defendant had been controlling. The victims' mother then stated that she had wanted to go to Alaska to be with her sick mother, but the defendant had told her that if she tried to leave, he would kill the baby and make her watch. Defense counsel objected, and a bench conference, which was not recorded by the court reporter, ensued. Back on the record, the trial court stated it was granting the motion to strike the testimony and instructed the jury to strike the question and answer from their minds and not to refer to it during deliberations. The court stated, "And as to your subsequent motion, [counsel], I would deny that at this time." The victims' mother then testified that the defendant did not permit her to wear makeup, certain colors, or revealing clothing and that he would not let her talk to her family in private. The defendant monitored her communications, and he would not permit her to get close to any friends. She testified that the defendant began to drink moderately during the time that the abuse occurred and became angry if there was not money for beer.

The victims and their mother identified a picture of the house where the abuse occurred. M.P., her mother, and the defendant's brother, who had briefly stayed on the couch, all testified that the house had one bathroom, which had no tub but only a shower.

M.P. testified that she, her brother, her sister, her mother, and the defendant all lived in the house together. One day, M.P's mother left the house and did not take M.P. with her. M.P. recalled that she was excited about getting ready for school the next day and that she was just starting kindergarten. M.P. went into the bathroom to take a

shower, and she shut the door. M.P. recalled that the shower curtain was tinted with a design on it, and the victims' mother confirmed that the shower curtain at that house had a wavy design to distort images. The defendant came in to use the bathroom, and M.P. was telling him that his shirt appeared to be a different color than it actually was because she was looking through the tinted curtain. The defendant was wearing baggy pants and either a blue or green shirt. After pulling up his pants and washing his hands, the defendant walked up to the shower, opened the curtain, and grabbed M.P.'s bottom. He pulled down his pants and underwear with his other hand, exposing his erect penis. He touched his penis to her stomach. M.P. did not hear a noise, but the defendant appeared to hear something because he suddenly jumped, pulled up his pants, and ran out. M.P. did not tell anyone because she was embarrassed and scared. Years later, she told first a friend, then her brother, then her mother, and finally the authorities. M.P. testified that she made her disclosure because she knew it was the right thing and she that would feel guilty if it happened to someone else.

M.P. testified that she and her mother and siblings moved to Alaska and that she returned to Tennessee to visit her father about two years after they moved. She stayed for two weeks and saw all of the defendant's family except the defendant, whom she had not seen from the time she moved from Tennessee to the time of trial. She testified that her brother now lives with their father in Tennessee because he was arguing with their mother.

S.P. also testified that he lived with his mother, two sisters, and the defendant when he was four or five and close to starting kindergarten. On one occasion, the defendant entered his room and told his twin sister to go outside. The defendant began to tell S.P. that he cared about him. The defendant then pulled down S.P.'s pants and began to touch S.P.'s penis. When S.P. told him to stop, the defendant told him to "shut up" and kept touching him. S.P. recalled another incident when his mother was out of the house and he was going to take a shower in the bathroom. The defendant came in while S.P. was undressing, showed his penis to S.P., and told S.P. to grab it. S.P. refused, and the defendant then forced him to touch the defendant's erect penis by putting his own hand over S.P.'s and moving S.P.'s hand to his penis. S.P. read a statement he had previously made in order to refresh his recollection then testified that the defendant had also told him to "[s]hut the F up" and slapped him prior to forcing him to touch his penis. S.P. testified that about three weeks after the incident in the bathroom, the defendant came to his room, acted "real nice," and told him not to tell anyone about the abuse.

S.P. testified that he was scared to tell anyone because he felt the defendant would "take it out" on him or his mother. S.P. disclosed the abuse when he was about eleven years old. He stated that his sister revealed something to him which he told his mother but that he did not tell his mother that he had been abused until about a year later. S.P.

4

testified he had not seen the defendant since the family moved to Alaska, although he had come back to Tennessee two years after the move for a visit to his father and although he currently lives with his father, the defendant's brother-in-law, in Tennessee.

S.P. acknowledged that he did not speak to anyone outside the family about the abuse for about a year after he told his mother. He asserted that he had only spoken with his mother once about the abuse and that she did not tell him what to say. S.P. testified he had a good relationship with his father and that he was close to his mother. He decided to move in with his father because he was arguing with his mother at the time.

The victims' mother testified that the family moved from the house in which the abuse took place to another home, which they shared with the defendant's mother, and that she eventually ended her relationship with the defendant. She testified that the defendant's mother actually helped her get to a shelter but made her promise not to reveal to the defendant that his mother had assisted her. The victims' mother then stayed briefly with a friend who was a police officer. She had left all of her belongings behind and had to wait while family and friends in Alaska raised money for airfare for herself and the children.

Virginia Dodson, a friend of the victims' mother and former police officer, testified that the victims and their mother stayed with her while they waited for family to raise money so that they could go to Alaska. Ms. Dodson knew the family well and recalled that S.P. had some issues in school with being aggressive; at one point, she was called in to speak to him at school. Ms. Dodson also testified that the defendant had briefly stayed at her house during a time when he and the victims' mother were separated. During this stay, he acknowledged being controlling of the victims' mother and expressed a desire to reform. During Ms. Dodson's testimony, the prosecutor asked her to recall a conversation with the defendant about being controlling. Ms. Dodson responded that she was a police officer at the time and that the defendant had been arrested. After a bench conference, which was not recorded, the trial court again instructed the jury to strike the answer from their minds and not to refer to it during deliberations. The trial court then stated, "As to your subsequent motion, [counsel], the Court would deny that motion."

The victims and their mother and sister were able to move to Alaska after a short stay with Ms. Dodson. The victims' mother first learned of the abuse about five or six years after it occurred, when the victims were eleven or twelve years old and living in Alaska. She was awoken by S.P., who was visibly shaken and emotional. The victims' mother at first thought he was having a seizure,[2] and he could hardly speak. S.P. told her

---

[2]Testimony outside the presence of the jury revealed that S.P. was subject to seizures as a young child.

5

to talk to M.P. The victims' mother found M.P. crying and on the verge of vomiting. After M.P. disclosed the abuse, the victims' mother made a report to the local authorities but did not pursue charges based on what M.P. had told her because she did not feel M.P. would be able to pursue charges. S.P. told her years later that he was abused. The victims' mother reported the abuse to the authorities immediately after S.P. told her about it. The victims' mother testified she then had difficulty pursuing charges because Alaska did not have jurisdiction over the crimes.

The victims' mother ultimately took the children to a children's advocacy center in Alaska where Investigator Joshua Trigg interviewed them. Angela Ellis, a forensic nurse, testified that she decided not to conduct a forensic exam because she would not expect to find any physical evidence based on the nature of the abuse and the timing of the disclosure.

The defendant's brother and mother testified on his behalf. The defendant's brother testified that he stayed with the defendant, the victims, and the victims' mother for a month in 2002. He stated that the family had financial issues and that he could not recall if the defendant had a job at the time. The defendant's brother testified that he loved all of the children and they all had a good relationship. He stated that he had no hard feelings about anything related to the children. He confirmed that the bathroom only had a stand-up shower.

The defendant's mother testified that the victims' mother left because her mother in Alaska was ill and because of financial trouble. The victims' mother asked the defendant's mother to drive her and the children to a location where she had a plane ticket waiting and to a second location after that. The defendant's mother acknowledged keeping from the defendant the fact that she was assisting the family in leaving but testified it was because she knew he would be distraught at the loss of his daughter. The defendant's mother testified she was not aware that the defendant forbade the victims' mother from wearing makeup, not aware that the victims' mother was hospitalized for depression after the birth of her third child, and not aware that the defendant tried to keep the victims' mother from returning to Alaska. She did not recall telling the victims' mother to keep her help a secret. She acknowledged that she knew the family did not plan to come back from Alaska. The defendant's mother testified that the defendant lay in his room crying and refusing to eat for four days after they left. However, she testified that she had "nothing against" the victims' mother.

The defendant testified that he never had sexual contact of any sort with either victim. On cross-examination, the defendant also testified that he never disciplined or spanked the children. He stated that when the victims' mother went for walks, he was usually outside with the children and was usually not the only adult there because his

6

friends and associates would be around.  The defendant testified that the house where the abuse was alleged to have occurred had a bathtub.  The defendant said he was working either at Target or doing roofing at the time.  The defendant did not recall when his family left or the year of his daughter's birth.  He denied controlling the family's finances and stated he gave most of the money earned to the victims' mother. He also denied that he forbade the victims' mother to wear makeup or to go to Alaska to her mother.  He stated that the family left without his knowledge because the victims' mother knew that she was taking his daughter.  He acknowledged that he made no efforts to locate his family and stated he did not know where they were.  When the prosecution asked him if he had discussed his controlling behavior with Ms. Dodson, he replied, "No. I went to jail and came back out and stayed at her house, yeah."

In rebuttal, the victim's mother testified that she and the defendant's mother had agreed that that they would not talk with the defendant about her leaving.  She reiterated that there was no bathtub in the house, that the defendant did not work during the time, and that they argued over his controlling behavior.

At the close of proof, the State specified that the aggravated sexual battery in Count 1 would be the defendant's touching of S.P.'s intimate parts in the bedroom, the aggravated sexual battery in Count 2 would be the defendant's forcing S.P. to touch the defendant's intimate parts in the bathroom, and the aggravated sexual battery in Count 3 would be the defendant's touching of M.P. in the bathroom.  The State specified that the solicitation charge was based on the defendant's telling S.P. to touch his penis in the bathroom prior to forcing him to do it.  The jury acquitted the defendant of the crime charged in Count 1 but found him guilty as charged in the remaining counts.  The trial court sentenced him to two consecutive ten-year terms for the aggravated sexual battery convictions and to five years for the solicitation conviction.[3]  The trial court denied the defendant's motion for a new trial, and the defendant appeals.

## ANALYSIS

### I. Mistrial

The defendant contends that the trial court erred in refusing to grant his motions for a mistrial.  The State counters that the argument is waived because the record did not adequately establish that the motions were made.  The State alternatively asserts that the

---

[3]The sentencing hearing is not part of the record.  We note that the judgment form for the solicitation conviction contains an error in that it shows that the conviction should run consecutively to the conviction Count 2 but concurrently with the conviction in Count 1, of which the defendant was acquitted. Because we conclude below that this offense should be merged into another conviction, we do not address the error.

7

trial court did not err in denying any motion for a mistrial.

It is the duty of the appellant to have prepared a transcript of the evidence necessary to convey a fair, accurate, and complete account of what transpired in the lower court. Tenn. R. App. P. 24(b). If such a transcript is not available,

> the appellant shall prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement should convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal. The statement, certified by the appellant or the appellant's counsel as an accurate account of the proceedings, shall be filed with the clerk of the trial court within 60 days after filing the notice of appeal.

Tenn. R. App. P. 24(c). Here, the record reflects that after both the testimony regarding the defendant's threat against his daughter and the reference to the defendant's incarceration, the trial court denied a motion made by the defense, but the record does not reflect what the motion was. The defendant filed no statement purporting to be an account of the proceedings, but we note that the trial court made the finding that it had properly denied a motion for a mistrial.[4] In any event, we conclude that the trial court did not err in refusing to grant a mistrial.

"The purpose of declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007). A mistrial should be declared only upon a showing of manifest necessity, that is, when a miscarriage of justice would result if the trial were to continue. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008). The appellant bears the burden of establishing manifest necessity. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). In evaluating whether the trial court abused its discretion, the appellate court may consider: "(1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof." *Welcome*, 280 S.W.3d at 222. The decision to grant a mistrial lies within the sound discretion of the trial court. *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003).

Here, the victims' mother referred to the defendant's attempt to prevent her from leaving by threatening his daughter, and Ms. Dodson referred to the defendant's

---

[4]The trial court's order only specifically references one motion.

8

incarceration. While both pieces of testimony came during direct examination, the answers were not directly responsive to the State's questions. The victims' mother was aware that she was not to testify regarding physical violence, but the trial court did not specifically tell her to avoid mentioning the threat and ruled that the testimony regarding the relationship between the parties could come in. After both statements, the trial court immediately issued curative instructions. We presume the jury followed the trial court's instruction. *State v. Reid*, 164 S.W.3d 286, 346 (Tenn. 2005) (appendix). These factors weigh in favor of concluding the trial court did not abuse its discretion. Regarding the third factor, the State's proof in this case depended entirely on the determination of the credibility of the victims and the defendant. In evaluating the effect of the stricken testimony, we also consider it relevant that neither piece of testimony was related to the crimes for which the defendant was on trial, limiting their prejudicial effect.

Appellate courts have previously upheld a trial court's refusal to declare a mistrial after a passing reference to the defendant's prior imprisonment. *Saylor*, 117 S.W.3d at 251 (trial court did not err in refusing mistrial based on admission of a recording in which defendant may have said he was "on parole" or "on the run"); *State v. Smith*, 893 S.W.2d 908, 923 (Tenn. 1994) (concluding that trial court did not err in refusing a mistrial when a witness referenced the defendant serving time in jail where the response was unsolicited, the court gave curative instructions, and the proof against the defendant was overwhelming); *Welcome*, 280 S.W.3d at 222 (concluding that trial court did not abuse discretion in denying mistrial for a reference to the defendant's incarceration when the reference was brief, was made in an attempt to explain a response, and the trial court had given curative instructions). A trial court's refusal to declare a mistrial because of testimony of a prior threat has likewise been upheld on appeal. *See State v. Dib Driver*, No. M2010-01570-CCA-R3-CD, 2011 WL 5356798, at *8 (Tenn. Crim. App. Nov. 8, 2011) (concluding that the trial court did not abuse its discretion in denying a mistrial when the victim's mother's testimony indicated that the defendant had pointed a handgun at her); *State v. Mathis*, 969 S.W.2d 418, 422 (Tenn. Crim. App. 1997) (upholding trial court's decision not to grant a mistrial based on a witness's reference to a prior threat made by the defendant in a trial for attempted murder, when the testimony was limited and the trial court gave prompt curative instructions). Accordingly, we conclude that the trial court did not abuse its discretion in refusing to declare a mistrial based on a witness's brief reference to the defendant's incarceration[5] and on the victims' mother's reference to the defendant's threat against his own daughter.

---

[5]Although the State argues that the defendant's own reference to his incarceration renders any error harmless, we note that the defendant's statement came after Ms. Dodson's testimony regarding the defendant's arrest during the State's case-in-chief and after the fact of the defendant's arrest had already been put before the jury. In any event, we conclude that the refusal to declare a mistrial was not error based on the analysis above.

9

## II. Character Evidence

The defendant also argues that the trial court's decision to admit the testimony of the victims' mother regarding the defendant's controlling behavior requires reversal because the testimony was improperly admitted character evidence. Under Tennessee Rule of Evidence 404(b),

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

The Tennessee Supreme Court has interpreted this Rule to apply only to "bad acts." *State v. Clark*, 452 S.W.3d 268, 289 (Tenn. 2014). Accordingly, testimony about behavior which is relevant and which does not constitute a crime or bad act is not analyzed under the Rule. *State v. Reid*, 213 S.W.3d 792, 814 (Tenn. 2006). However, behavior that, while not criminal, constitutes a "moral 'wrong'" must meet the strictures of Rule 404(b). *Clark*, 452 S.W.3d at 289. Possession of a handgun and knife are not "bad acts" requiring the application of the Rule. *Reid*, 213 S.W.3d at 814. On the other hand, viewing pornography is. *Clark*, 452 S.W.3d at 289. Likewise, an adult giving a minor a romantic kiss and inviting the minor to spend the night in a note are "bad acts" which require the application of the Rule. *See State v. Margaret L. Holt*, No. E2010-02128-CCA-R3-CD, 2012 WL 826523, at *11 (Tenn. Crim. App. Mar. 13, 2012). The State argues that the evidence given by the victims' mother would not qualify as "bad acts" and that the trial court did not admit this evidence under Rule 404(b) but under the

general rules of relevancy.

When the prosecution began to question the victims' mother regarding conflict in the household, the defense asked for a jury-out hearing to determine whether the testimony would constitute impermissible character evidence. After hearing the proffered testimony regarding both the defendant's controlling behavior and the defendant's acts of violence, the trial court ruled that the evidence regarding the defendant's violent acts toward the victims' mother could not come in because there was no material issue to which the evidence was relevant other than the defendant's propensity to criminal behavior. On the other hand, the trial court concluded that the evidence of the relationship between the victims' mother and the defendant was relevant to the material issue of the victims' reasons for not reporting the abuse. The trial court did not make a finding regarding whether the evidence of the acts was clear and convincing, and the court did not explicitly state that the probative value of the evidence was not outweighed by the danger of unfair prejudice. It is unclear if the trial court was analyzing the evidence regarding the defendant's controlling behavior under Rule 404(b) or under the more general rules of relevancy.

After the court's ruling, the victims' mother was permitted to testify that she was not allowed leave the house except for a daily forty-five-minute walk during which she was accompanied by the defendant's sister-in-law; that the defendant did not allow her to wear makeup, certain colors, or revealing clothing; that the defendant would not permit her to talk to her family in private; that the defendant would monitor her phone calls; and that the defendant sought to prevent her from forming close friendships. She testified that she went to a shelter after she left the defendant. While these acts may not elicit the level of moral disapprobation that the sexual acts in *Holt* and *Clark* do, "[w]here the evidence of other crimes, wrongs, and acts may reflect upon the character of the accused, the procedure set forth in Rule 404(b) should be followed, even though the evidence is offered to prove a material fact not necessarily related directly to the accused." *State v. DuBose*, 953 S.W.2d 649, 655 (Tenn. 1997). In any event, we conclude that, even under the more stringent standards of Rule 404(b), the evidence was properly admitted.

The State bears the burden of persuasion with regard to the admissibility of evidence under Rule 404(b). *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012). When the trial court complies with the procedures of Rule 404(b), the decision to admit evidence is reviewed for abuse of discretion. *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002). When the trial court fails to substantially comply with the procedural requirements, the reviewing court determines the admissibility of the evidence de novo. *DuBose*, 953 S.W.2d at 652. Because the trial court did not make an explicit finding that the evidence supporting the prior bad acts was clear and convincing or that the danger of unfair prejudice did not outweigh the probative value of the evidence, its ruling is not

11

given deference on appeal. *See Sexton*, 368 S.W.3d at 404 (concluding that the trial court's decision was not entitled to deference when it failed in its obligation to find that the prior bad act was proven by clear and convincing evidence); *DuBose*, 953 S.W.2d at 652-53 (concluding that the trial court failed to comply with the procedures when it did not state the material issue to which the evidence was relevant or balance the probative and prejudicial value).

We conclude, nevertheless, that the trial court did not err in admitting the evidence. Although the court did not make a finding that the evidence supporting the defendant's actions was clear and convincing, the victims' mother testified in detail regarding the circumstances of her relationship with the defendant, who she testified was violent and controlling. Ms. Dodson confirmed that the defendant was controlling of the victims' mother and that he acknowledged being controlling. The defendant's mother assisted the victims and their mother in leaving secretly, although the defendant's mother knew they planned not to return and although she thought it would distress the defendant. Accordingly, the evidence of the defendant's acts was clear and convincing. The evidence was also relevant to a material issue at trial. The defense explored during opening statements and cross-examination the timing of the victims' disclosure of the abuse. The evidence that the defendant controlled many aspects of the victims' mother's life, from the times she was permitted to leave the home to the clothing she wore to her communications with her blood relatives, was relevant to show why the children would not disclose the sexual abuse to their mother, who was under the defendant's control. Although the defendant notes that the disclosure did not take place immediately after the children and their mother left the defendant, the testimony showed that the children lived with the defendant for over a year after the abuse occurred and only later left the state. Finally, we conclude that the evidence was not unfairly prejudicial. We conclude that the defendant is not entitled to relief.

### III. Prosecutorial Misconduct

The defendant next alleges that the prosecutor engaged in misconduct by vouching for witnesses, inflaming the passions or prejudices of the jury, injecting broader issues than the guilt or innocence of the accused, and referencing facts outside the record during closing argument. The defendant cites twenty-five instances during closing argument where he alleges the argument was improper. The State counters that the defense only lodged one objection during argument and has waived any other alleged errors. Our review of the record has revealed that the defendant objected three times during closing argument to the prosecution's statements. The record shows that the defendant's first objection was made when defense counsel was able to see from the prosecution's PowerPoint presentation that the prosecution would be referring to witness credibility. During the bench conference, the defense clarified that it was objecting to any future

12

references to the credibility of witnesses because it considered the references to be vouching for witnesses. The defense noted that because the PowerPoint slides covered several topics per page, it was difficult for the defense to properly time its objections. Defense counsel also lodged two objections which he does not raise on appeal. We conclude that the defense has at most preserved the issue regarding the improper expression of a personal belief or opinion as to the truth or falsity of evidence or guilt of the defendant.

Closing argument is a valuable privilege that should not be unduly restricted. *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). Closing argument must remain, however, temperate, predicated on the evidence adduced at trial, and pertinent to the issues. *State v. Jordan*, 325 S.W.3d 1, 64 (Tenn. 2010). The prosecution, which is taxed with seeking justice rather than mere advocacy, is more limited in its prerogative during closing argument. *Id.* "[W]hile prosecutors 'may strike hard blows, . . . [they are] not at liberty to strike foul ones.'" *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). The trial court is given significant discretion in controlling closing argument. *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). There are generally five areas of prosecutorial misconduct in argument:

> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
>
> 2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.
>
> 3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.
>
> 4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.
>
> 5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (quoting Standards

13

Relating To The Prosecution Function And The Defense Function §§ 5.8–5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)) (citations omitted). When a court concludes that the prosecutor's argument was improper, the verdict will not be overturned unless the impropriety affected the verdict. *Jordan*, 325 S.W.3d at 65.

During argument, the prosecutor referred numerous times to the evidence admitted at trial and its effect on the motivations of various witnesses to be truthful. The prosecutor referenced, for example, the embarrassment that the victims must have felt while testifying. The prosecutor also mentioned the close ties between the families and the awkwardness that would result for the victims. She urged the jury to ask themselves why the victims would fabricate the accusations. She also asked the jury if there was any reason for Ms. Dodson to testify falsely regarding the defendant's behavior. She referred to the defendant's testimony, noting the fact that the defendant had no explanation of the offenses. She pointed to the defendant's statement that the house had a tub, to his denial that he spanked S.P., and to his inability to name the date his family left despite his testimony that he was distraught at their leaving as facts to be considered in evaluating his credibility. The prosecutor noted that although the defendant claimed that others were at the house when he cared for the children, he did not call those witnesses to testify and did not recall where he worked at the time. The prosecutor stated that although the defendant's mother denied asking that her aid to the victims and their mother be kept a secret, her testimony might have been motivated by partiality for the defendant. The prosecutor pointed out that the defendant's mother and the defendant's brother never questioned the honesty of the victims or their mother, and she noted that the victims did not contradict themselves.

Having reviewed the statements of the prosecutor, we conclude that the trial court did not err in finding that she did not improperly express a personal belief or opinion as to the truth or falsity of any testimony or evidence. The bulk of the prosecutor's statements were summarizing the evidence and highlighting the way in which the jury might draw inferences from the evidence regarding the credibility of witnesses. The prosecutor never stated a personal belief in the veracity of any witness. The defendant is not entitled to relief.

## IV. Cumulative Error

Finally, the defendant asserts that he is entitled to relief due to cumulative errors at trial. Cumulative error recognizes that "there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76

(Tenn. 2010). Because cumulative error is only applicable where the accused has established there was more than one error committed, the defendant cannot premise relief on this theory. *Id.* at 77.

## V. Dual Convictions

Although neither party raises the issue, we next consider whether the defendant may be convicted both of aggravated sexual battery and of solicitation to commit aggravated sexual battery based on the incident with S.P. in the bathroom. *See* Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). The State specified during closing argument that the conduct alleged in Count 1 was the sexual contact between the defendant and S.P. in the bedroom and that the conduct alleged in Count 2 was the sexual contact between the defendant and S.P. in bathroom. The State further specified that the basis for the solicitation charge in Count 4 was the defendant's demand that S.P. have sexual contact with him in the bathroom.

As pertinent here, solicitation of a person under eighteen years of age makes it an offense for a person eighteen years old or older:

> to intentionally command, request, hire, persuade, invite or attempt to induce a person whom the person making the solicitation knows, or should know, is less than eighteen (18) years of age . . . to engage in conduct that, if completed, would constitute a violation by the soliciting adult of . . .
>
> (4) Aggravated sexual battery, pursuant to § 39-13-504."

T.C.A. § 39-13-528(a) (2010).

Tennessee Code Annotated section 39-12-106 addresses multiple convictions, and it provides that "[a] person may not be convicted of criminal attempt or solicitation and the offense that was the object of the attempt or solicitation." T.C.A. § 39-12-106(b); *see also* T.C.A. § 39-12-102 (prohibiting solicitation of a criminal offense), Sentencing Comm'n Cmt. ("If the offense solicited did occur, however, the defendant may not be convicted of both the solicitation and the completed offense. The solicitation is merged with the completed offense, and the offender may be guilty of the completed offense under § 39-11-402.").

Here, the evidence at trial was that the defendant commanded the five-year-old

15

victim to touch the defendant's penis, and when the victim refused, he immediately forced the victim to do so by covering the victim's hand with his own and moving the victim's hand to his penis. Under Tennessee Code Annotated section 39-12-106(b), the defendant may not be convicted of both the offense of solicitation of aggravated sexual battery and the offense of the particular aggravated sexual battery which was the object of the solicitation. *Compare Chivous S. Robinson v. State*, No. W2013-02622-CCA-R3-HC, 2014 WL 2993913, at *2 (Tenn. Crim. App. June 30, 2014) *perm. app. denied* (Tenn. Nov. 19, 2014) (defendant's convictions for second degree murder and solicitation of first degree murder did not merge when the defendant solicited a man to kill his wife, the man was arrested on unrelated charges prior to acting on the solicitation, and the defendant and an accomplice then accomplished the crime). Accordingly, under these circumstances, we conclude that Count 4 must merge into Count 2 pursuant to Tennessee Code Annotated section 39-12-106(b).

We further note that two of the judgment forms for the defendant's three convictions have legibility issues,[6] and two do not have a mark next to the box indicating that the jury found the defendant guilty. Accordingly, on remand, we instruct the trial court to indicate the merger of offenses and also to correct any technical issues with the judgment forms.

## CONCLUSION

Based on the foregoing, we affirm the defendant's convictions and remand for merger of the solicitation conviction and correction of the judgments.

_____
JOHN EVERETT WILLIAMS, JUDGE

---

[6]The issues appear unrelated to copying done for the purposes of appeal.